Good morning. May it please the court, Jason Jaddy from Michael J. Diamonstein, PC, on behalf of OCM Barry. Could you lift the microphone? Yes, Your Honor. Thank you. With the court's permission, I would like to reserve two minutes of rebuttal. All right, that's fine. Your Honor, in this case, we are asking one of two things, either that this court grant Mr. Barry a new trial or that this court grant Mr. Barry a new sentencing. Now, with respect to the issue of the new trial, the claim violation is a violation of Doyle v. Ohio. I'm going to rest on the brief with respect to the actual violation, and I'd just like to address... Even if there were a Doyle violation, how do you get past harmless error? Your Honor, we get past harmless error because of the nature of the evidence in this case. Specifically, we had turncoat witnesses, cooperating witnesses, witnesses who are obviously... The jury knew all that, right? They did, Your Honor, and so the issue then becomes whether or not the jury could properly evaluate that testimony, having heard what we are submitting is a violation of Doyle. It's our position that our client was impeached, although not directly while testifying, but he was impeached with respect to the exercise of his Miranda rights. But the judge didn't... The judge allowed the objection, and there wasn't a lot made of this. It's not like this was the main argument made at sentencing. I mean, at the closing to the jury, that it was the focus, and there was other evidence. I think we are a little more interested in the sentencing issue, and with respect to Doyle, I think we have all of your briefing and your argument. Yes, Your Honor, and I'll move on. So there's two issues with respect to the sentence. Do you think we should send it back in light of D'Allo for what? I do, Your Honor, yes. The decision in D'Allo, while I wouldn't go so far as to say it was a surprise to everybody, I do think it was a surprise to some people, because I think that there were... The district court certainly did not have the benefit of that. That's correct, and I think that where there is the circuit split, because there are other courts held in D'Allo, I think that we really, we can't be sure that the decision was made properly, but even when you look at... But I think one of the problems with this fact pattern is that, I mean, it's one thing when you have checks, and everyone knows the amount of the checks, but with respect to the credit limit on credit cards, the concept of intended loss calls to mind what's going on in the mind of the criminal, and if there's no evidence that the criminal had any knowledge of the credit limits, then you can't really equate intended with the credit limits, it seems to me. I absolutely agree with the court. Which brings me to a factual matter that I don't know the answer to, and maybe it's in the record, hopefully both sides can clarify this for me. First of all, we were talking about multiple credit cards, right? That's correct. A good many of them. That's correct. Were these credit cards that the defendant had personally applied for, fraudulently, and obtained, or were these credit cards that had been stolen from someone else who had properly obtained the credit card, or both? My understanding from the testimony, we were actually not trial counsel, we were hired after. My understanding from the testimony, and I'm sure that my colleague would be able to elaborate on this as well, the cards at issue were actually Visa gift cards that were account numbers and access numbers were then using some sort of a device placed onto the Visa cards. All right, so these were not credit cards in the ordinary sense? These were not, they weren't debit cards, they were not credit cards in the ordinary sense? Were they fixed amount cards that had been purchased? Initially, the physical cards were fixed amount. This is important, right? Because if you're talking about a stolen credit card from another person, the person who steals it has no way of knowing without some careful study that probably cannot be carried out what the credit limit is on it. He further would not know how much had been expended at that credit level for purposes of available credit that's left. That's exactly correct. But if this is a fixed gift card of some kind that bore some indicia of its value. And the defendants had fixed. Right, right. Then that takes my theory of intended. So I just want to try to clarify. These are important facts it seems to me that will determine ultimately how this intended loss comes out. Certainly. So just again to state what I was saying, the Visa gift cards were stripped of their value as Visa gift cards if there indeed ever was value to those cards. And then the allegations are that account numbers from credit cards wherever they came from were then placed onto those Visa gift cards. And then those Visa gift cards were used as if they were credit cards. But the record does contain the analysis which formed the basis for the district court's ruling on sentencing as to the maximum amount of all these cards. By calling the institutions, the government did that. Was this the maximum amount before they were stripped? Or was the maximum amount changed when they were stripped? Well, the maximum amount that would have been on the cards that were seized by the Huntington Township Police in New Jersey, the maximum amount on those cards would have been the maximum credit limit on any one of the numbers that were loaded onto the cards, if that was clear. I guess this line of questioning heightens the need for the, quote, unquote, deeper analysis. And, Your Honor. That we have said even before Diallo is really necessary in order for the district court to say, okay, I find that this was the intended loss. Yes, Your Honor. And I agree with the court because we have testimony of record. I've noted it in my brief 507 where one of the co-conspirators actually explains what he was doing in the store. He would select the items and he would use one card for only a few items because, and I'm paraphrasing, he didn't know what the value was and, therefore, it would look suspicious if he's maxing out cards. And you could probably figure out based upon how many cards were used and what limit they were used to and how many cards remained that if they had kept going and maybe did 300 or 400 on each of these cards. But, again, that would be a matter for evidentiary. That's correct. I also did want to address the one, the issue with respect to the actual evidence that was used to determine the cards. We raised an objection to that at sentencing because we didn't feel that that was really sufficient enough. There were, you know, not to suggest that the agent would have done anything unethical or that he would have lied, but there was just too much room for error in so much as calling institutions, giving institutions numbers, and then transcribing them down. Well, this is, I mean, this is the sentencing phase. I mean, why was his research investigation and testimony not enough in terms of its reliability? Because, Your Honor, the fact that he was, I mean, giving this oral. Is that your stronger issue here? It's not, Your Honor. I just wanted to make sure that I touched on it. But to go back to the actual, the need for analysis, I think that when you actually look at the transcript of the sentencing. It doesn't look like deep analysis in terms of what the allow would have had in mind or would require. I beg your pardon? It doesn't look like the kind of deep analysis contemplated by the allow. No, sir. And that is why we are asking for a new sentencing. The other thing that I did want to draw the Court's attention to was the objection with regard to the 3C1 enhancement for obstruction of justice. It's our position that the analysis that was employed in order, during sentencing, was far from what should be employed. What case helps you here? The Dunnigan case from the United States Supreme Court. The Dunnigan case, I mean, I quoted in the brief, the Dunnigan case says that, you know, there should be independent, I believe the word is findings, regarding what is supposed to be perjury. Well, Mr. Perry testified, I didn't commit any crime, right? Yes, Your Honor. That is correct. He did. He was found to be guilty. Therefore, one may assume that he lied under oath when he made that statement. Yes, Your Honor. And the key word I think there is assume. As I state in my brief and as we raise the sentencing memorandum and our objections to the pre-sentence investigation report, just because someone is found guilty does not mean that the jury made the correct decision. And I draw the Court's attention just to the recent cases where people have been exonerated by DNA evidence. It would be absurd for any of us to say that somebody exonerated of, let's say, a rape or a homicide, who had testified during trial and said, I didn't do it. It would be absurd to say that they committed perjury, even by a preponderance. All right. So what if a jury were to convict him of perjury and that would be the basis for the enhancement? Are you saying that we can't, you can't value that, you can't use that? If the jury had convicted him of perjury? Yeah, of perjury. Well, I mean, I think that you could definitely use it. You would have no problem with that, would you? I mean, isn't the problem here, according to you, that the district court failed to make adequate findings with respect to what was the allegedly perjurious testimony? Exactly. That is absolutely the case. And, again, you know, perjury wasn't charged. It wasn't something the jury considered. But with respect to the district court's findings, it seems that we just assumed that because he was found guilty that, therefore, that enhancement is appropriate. But realistically, if this goes back and we instruct the court, the court is going to say what Judge Roth said. He said he didn't commit a crime. The jury said he did. He, therefore, didn't tell the truth in that enhancement. I mean, it's not a very high bar with the enhancement, quite frankly. It's not, Your Honor. But we still submit that during sentencing you have an absolute right to be sentenced under correct guideline calculations, under correct information. And, I mean, the precedent of this court is that the first step for a court, a district court, is to determine the guideline range. And so we don't think that it was appropriately done in this case, either with the 3C1 enhancement or the intended loss enhancement. And I see that my time is up until my rebuttal. All right. That's fine. Good morning. May it please the Court, my name is Michelle Olszewski. I represent the United States of America in this case against Mr. Berry. Can I pull the microphone down just a little bit? Yes. Is Olszewski spelled with an F? There are many an Olszewski spelled with a W in your area. And I'm not related to any of them. You're the first one spelling with an F, I see. I'm not related to the famous ones in my area. Peter Pol. Your Honor, Your Honors, I was going to cut to the chase with respect to the Doyle violation. Recognizing and not conceding that a Doyle violation had occurred, it really doesn't matter because of the overwhelming evidence in this case, both in quantity and quality. So the error, if any, was committed, was harmless beyond a reasonable doubt. I will move on to the Diallo issue because it appears the Court is most interested in that. And I'm surprised that the government took the position that it did in light of Diallo, rather than simply saying, why don't you send it back? Isn't that the cleanest, easiest thing to do here? Well, Your Honor, we're not willing to concede that this judge in this case made no findings with respect to the intended loss. Can you clarify the issue concerning the credit cards or gift cards or whatever they were, factually for our purposes? Because it seems to me that that ultimately drives the valuation here and the intended loss valuation. That is correct, Your Honor. We have a fact pattern that is clearly distinguishable from Diallo, the underlying facts as well as what occurred at sentencing. What Judge Munley, the district court judge, did at sentencing is he made findings because he did not simply adopt what was in the pre-sentence report. What we have here and what was presented at trial was a conspiracy. The key day of that conspiracy was February 29, 2009, when this defendant was actually caught in the act with his cohorts. At that time, and what the trial evidence established, was that these cohorts traveled from New York armed with the 81 fraudulent credit cards. They were disguised in the form of gift cards. But what had happened and what was established at trial was that these individuals obtained compromised credit card account numbers. And the expert witness that testified at trial, the Secret Service agent, testified that the way this happens is you upload those numbers onto cards. So the physical carrier for that credit card number was a card. It was a physical card. But the numbers were compromised credit card account numbers, such that the number that appeared on the front of the card did not match the number that came up. Was there any evidence that the defendants had any idea what the credit limits were on these cards? No, Your Honor. And would not the testimony of the one saying what he did, that he didn't charge too much on one card because he didn't know what the credit limit, if you're a district court judge, don't you have to take into account in determining the intended loss exactly how much they probably were going to charge on these cards, not the credit limit, which they didn't know about, but okay, but I put two of these games on it, but I didn't want to run up against the credit limit. And you have to analyze what's possibly, I mean it's conjecture perhaps, but what's going on in the mind of the criminalist's intent. So how can this withstand, how can we affirm the analysis or lack of analysis that was done here? I think that the district court judge did that in this case, Your Honor, and here's why. The evidence that was presented in the filings pre-sentence, the arguments were laid out. The district court judge had the benefit of a pre-sentence report. We made arguments at sentencing on 102 credit cards that were involved in the overall conspiracy, and that was the recommendation that was made in the pre-sentence report, but this judge did not adopt that finding. What this judge did after reading the papers and listening to the arguments and having been the trial judge, he said I'm only holding this defendant accountable for the 81 cards that were found in his possession on this day. But the maximum credit limit of every one of those cards. Yes, Your Honor. Where is the finding that supports that as the intent of the defendants? I think the finding that supports that is the defendant's actions and the testimony that was presented at trial such that you're correct in that one of the co-conspirators testified that there was some kind of strategy involved in the use of those cards. But all three co-conspirators also testified that at times when the cards were rejected, they went back and they returned those cards to Mr. Berry and to Mr. Camaro and then they were resupplied with new cards. So we certainly can't see the intent of the defendant's mind. He certainly did not know the maximum limits, but his actions tell us that he and his cohorts intended to use those cards until they were exhausted. And also it's important that they came from New York on that day armed with those 81 cards. They engaged throughout the late evening and into the next morning when they were apprehended in using those cards to commit fraud in seven Walmarts. So had they not been caught, it's certainly reasonable to presume that they would have continued to use those cards until they were all rejected. But you're now making findings that we don't have from the district court. And that's why the deep – I mean, you're giving us what you think is the deeper analysis, but it wasn't done. I think that it can be found, Your Honor, in the fact that Judge Munley held him accountable for only the 81 cards and having – Well, what evidence was there that there were more cards than that? Because this was an overall conspiracy and different dates were evidenced at trial of these same individuals engaging in the same fraud at other Walmarts prior to the date they were caught. Those credit card numbers were included in the overall calculation that was included in PSR, but Judge Munley said, No, I'm only going to hold him accountable for the 81 cards. And then the judge went on to acknowledge at sentencing, but I am taking into consideration the filings that are of record and the arguments that are made here. So we do have that specific finding by Judge Munley. We also have implicitly, albeit not articulated by Judge Munley, the fact that he was a trial judge. So he heard about the use of those cards. That doesn't help us in terms of reviewing his reasoning for the ultimate value determinations, loss value determinations that he made. Correct me if I'm wrong, but there were no specific findings made at sentencing relative to the matters I've inquired about concerning the nature of these cards. The district court judge stated on the record at sentencing, I am going to, using his exact words, but he said the loss is going to be based upon the 81 cards that were found in the possession of the defendant and his co-defendants. And I believe that that is something that was not present in Diallo. Diallo was a different factual scenario where Mr. Diallo was held accountable for over 200 credit card numbers that were found on various media, a hard drive and a jump drive. And the court was concerned that there was no evidence that he even controlled those numbers. It's different here, and I think by virtue of the fact that Judge Munley only held Mr. Berry accountable for the 81, only held him accountable for the ones he controlled and intended to use throughout that crime spree that occurred on February 29, 2009. And there was no rebuttal to that by Mr. Berry or his counsel, and the burden of the government is really by preponderance. But I do appreciate the court's concern in light of Diallo, which Judge Munley did not have the benefit of. Although before even that, with Titchell and other cases, we set a deeper analysis as to what really is intended. Your Honor, in the Giebers case, the courts used the term subjective intent. And criminal law, how we show what's going on in the defendant's mind is his actions. And that was evidenced here. And because Judge – Well, yes. We determined it by circumstantial evidence. And some of the circumstantial evidence here actually strike that. It was more than circumstantial. It is evidence of another participant saying that by design we weren't trying to run up a maximum. That certainly would seem to run contrary to what you're asking us to infer or what you're suggesting the district court had the right to infer. That same co-defendant that testified about maybe not drawing suspicion to himself by not including a lot of merchandise in one purchase also said that when cards were rejected, he returned them to Mr. Berry and Mr. Camara and received new cards. Yeah, but we don't know what that means. If there was a card with a $1,200 credit limit and he wanted to put $400 on it and the card was rejected, that's not evidence of intended loss of $1,200. If, on the other hand, he wanted to buy four games and the price was going to be $1,300 and the credit limit was $1,200, then that's something else that it does show an intent to run it up. But we don't have that. But just by virtue of it was rejected so I get another one doesn't show that $1,200 was the intended loss. I mean, it's apples and oranges. And again, Your Honor, the finding made by Judge Munley, which I think is critical, in that he only held Mr. Berry accountable for the cards he possessed on this one day, which they continued to use repeatedly throughout the night. But was he given evidence of other cards specifically that he then rejected? Judge Munley was, Your Honor, because there were 102 credit cards that were presented in evidence at trial. 102, the value of 102 credit cards was presented to Judge Munley in the PSR. I believe it was $863,000, and Judge Munley rejected that. He did not summarily include that aggregate number. He specifically held Mr. Berry accountable for the $81,000. That's on the record, and that was the $81,000. That was about $200,000 less than the intended. But here, where they had done so far, they had charged $13,400 or so, and you say the intended was $675,000. It just, you know, there needs to be some explanation. And to that, Your Honor, I would say that the only thing that stopped these individuals from reaching that maximum was the fact that they were caught. And the evidence at trial established that. I appreciate the fact that Judge Munley did not articulate that on the record, but he did make findings, and that is on the record. And that's what distinguishes this case from Diallo. With respect to the perjury charge, if the Court would like me to address that, there's no question that this defendant committed perjury, and he could have been charged with perjury. But were the findings sufficient by the Court that they comply with our precedent? Well, it does, Your Honor, because in the case of United States v. Bogie, which is a decision made by this Court after the Dunnegan case, the Court in Bogie specifically said that it's preferable that the district court articulate the elements of perjury on the record to apply the enhancement. However, the expressed factual findings are not necessary. As long as we can infer from the judge's decision that he considered the perjurious testimony, that is sufficient. And that occurred in this case. Dunnegan actually says that. The judge doesn't have to make element-by-element determinations. He does not, Your Honor, and this Court has said that. And certainly in this case, because the defendant could have been charged with perjury on multiple aspects of his testimony, and because the filings of the parties argued this, there was argument at sentencing from both parties, and Judge Monley specifically said, I am considering these arguments and these filings. And to that point, he reached the conclusion that the enhancement for perjury, that obstruction charge, was appropriate. And there is no need to send this case back on that issue to have the district court judge state the obvious. Thank you. Counsel, how about we really said in our case law that, you know, it's implicit in the jury's, with respect to the obstruction, implicit in the jury's verdict. Fiorelli, we said we really don't need to send the findings, we don't need to remand because the court didn't, quote, engage in a ritualistic exercise. Now, isn't there really enough here? What more would the district court need to do on remand? I would defer to the Dunnegan case where the Supreme Court suggests that, and actually really states that there's a little bit more that needs to be done with respect to specific areas of testimony that he thinks were perjurous. Although we've rejected the idea that under Dunnegan, the district court has to make an independent finding of perjury. Our reading of Dunnegan is not in accordance with what you're saying. And I do understand that, but in a case like this where, I mean, I believe my co-counsel used the word state the obvious, I don't think that necessarily it's all obvious. Just to touch on one other aspect of the deeper analysis that was required, I'm going to bring the court's attention to facts that were elicited. During trial, definitely during sentencing, that there were certain cards that were recovered that were either duplicates or had value that was, excuse me, the cards had been canceled. And certainly that would lend a little bit of an explanation to where they're saying, well, we tried to use the card, it came back. So, I mean, it's possible that there were more cards there because they don't know what's going on, and therefore they just bring extra to get to whatever it is that they want to get. And, again, it just goes back to why we need that deeper analysis and to receive testimony on that. Thank you very much for your time. Thank you very much. The case is well argued. We'll take it under advisement.